UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

Case No. 3:01-mc-00044-SRU

IN RE APPLICATION OF VIKTOR KOZENY
FOR JUDICIAL ASSISTANCE PURSUANT TO
28 U.S.C. § 1782

**EX PARTE APPLICATION FOR AN ORDER DIRECTING DOCUMENT DISCOVERY FROM FREDERIC
BOURKE PURSUANT TO 28 U.S.C. § 1782 AND SUPPORTING BRIEF**

Applicant Viktor Kozeny respectfully submits this *ex parte* Application for an order for

judicial assistance pursuant to 28 U.S.C. § 1782 and files herewith the accompanying

Declaration of Jacob A. Hill ("Hill Decl.") identifying pleadings and exhibits in support of this

Application. Kozeny seeks the appointment of a Commissioner of the Court to facilitate the

issuance of a subpoena duces tecum to Frederic Bourke Jr. ("Bourke") who resides or may be

found in this judicial district, for use in connection with litigation pending in the High Court of

Justice, Queen's Bench Division, Commercial Court in England. The High Court has scheduled

the trial of 10 to 12 weeks to commence on January 12, 2009. The pending litigation is

captioned *Marlwood Commercial, Inc. v. Kozeny, et al.*, 1999 Folio No. 1515 and *Omega Group

Holdings Ltd., et al v. Kozeny, et al.*, 2000 Folio No. 199 (the "London Actions"). (Hill Decl.

¶ 2)

I.      **THIS COURT ROUTINELY GRANTS § 1782 APPLICATIONS EX PARTE**

Preliminarily, courts in the Second Circuit routinely grant requests for judicial assistance

that are made ex parte. *See, e.g., In re Application of Esses,* 101 F.3d 873, 874 (2d Cir. 1996)

(applicant made a "successful ex parte application"); *In re the Application of Servicio Pan

Americano De Proteccion, C.A.,* 354 F. Supp.2d 269, 270 (S.D.N.Y. 2004) (Court exercised its

discretion under 28 U.S.C. § 1782 to grant Pan Americano's applications because issuance of the order would further the interests of the federal statute and aid the Venezuelan tribunal hearing the underlying suit in reaching an efficient and accurate disposition of HSBC's claims against Pan Americano); *In Re: Application of Imanagement Services LTD.,* Case No. Misc. 05-89 (FB), 2005 U.S. Dist. LEXIS 17025, *22 (S.D.N.Y., August 16, 2005) (granting discovery under § 1782 because such discovery would further the "twin aims" of the statute.); *In re Application of Horler*, 799 F. Supp. 1457, 1461 (S.D.N.Y. 1992) (the court "issued an ex parte order allowing Mr. Horler to take depositions of certain witnesses"); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 142 Fed. Appx. 516, 518 (2d. Cir. 2005) (district court did not abuse its discretion by entering a § 1782 order); *Application of Sumar*, 123 F.R.D. 467, 468 (S.D.N.Y. 1988) ("petitioner moved ex parte for an order designating a commissioner to take the deposition of Citibank and for a subpoena duces tecum, pursuant to 28 U.S.C. § 1782 and the . . . motions were granted and the subpoena and Order were issued"); *Petition of Avant Industries, Ltd.*, 1980 U.S. Dist. LEXIS 14170, *3 (S.D.N.Y. 1980) (Petitioner's "discovery was granted by ex parte orders issued by courts in the respective districts"). As this Court explained in *In re Letter of Request*, 138 F.R.D. 27 (S.D.N.Y. 1991), "ex parte applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *Id.* at 32 n.6. Accordingly, this Application is properly submitted for the Court's consideration.

## II.   FACTUAL BACKGROUND

This Application relates to a $200 million controversy arising out of a series of investments in the privatization program by which the Republic of Azerbaijan, a former Russian

2.

state, began privatizing its state-owned enterprises. The feuding investors are a "who's who" of financial institutions and hedge funds, namely AIG and Omega Advisors, who handed over $200 million of cash for Viktor Kozeny to fly in suitcases to Baku, Azerbaijan to "invest" and take over Azerbaijan's state-controlled oil company. Frederic Bourke is the subject of an Indictment filed in the United States District Court for the Southern District of New York entitled United States of America v. Viktor Kozeny, Frederic Bourke Jr., and David Pinkerton. (Hill Decl., Ex. 26)

The claimant in 1999 Folio No. 1515 is Marlwood Commercial Inc. ("Marlwood"), a British Virgin Islands (BVI) subsidiary of the U.S.-based insurance company National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), which itself is a subsidiary of American International Group, Inc. ("AIG"), the consolidated assets of which exceed $134 billion. The claimants in 2000 Folio No. 199 are all BVI companies (the "Omega Claimants") set up as investment vehicles for Omega Advisors, Inc. ("Omega"), a $4 billion dollar hedge fund manager, which has entered into a non-prosecution agreement with the United States Attorney for the Southern District of New York and paid a $500,000 penalty. Marlwood and the Omega Claimants are hereinafter referred to as the "Claimants." The Claimants filed an Amended and Consolidated Particulars of Claim dated March 13, 2007, which supersedes and amends the 1999 Folio No. 1515 and 200 Folio No. 199 Particulars of Claim. (Hill Decl., Ex. 20)

In February 2000, the Claimants, plus National Union, brought a similar action against Kozeny and certain other entities in the U.S. District Court for the District of Colorado, No. 00-B-383. On September 25, 2000, the District Court issued an order staying the U.S.

litigation pending the outcome of the London Actions. (Hill Decl., Ex. 1) In so doing, the Court opined that Kozeny would not be prejudiced by having to proceed in England because he could "still seek documents and testimony from U.S. witnesses under . . . 28 U.S.C. § 1782, which provides for production of documents and taking testimony in aid of foreign litigation." (*Id.* at 12) The Court's statement echoed an earlier statement by U.S. counsel for the Claimants to the London Court that "[i]n addition to whatever discovery is available in the United Kingdom, under United States law Mr. Kozeny can take testimony and seek documents from witnesses in the United States in aid of the London proceeding." (Hill Decl., Ex. 2, ¶ 19 (citing § 1782))

Kozeny did, in fact, seek such documents and testimony from various witnesses, including Mr. Bourke, by making a request for discovery under § 1782. The § 1782 request as to Bourke was made in this Court, by an Ex Parte Application filed January 30, 2001. (Hill Decl., Ex. 22) The Court granted Kozeny's previous *ex parte* application and authorized issuance of the same subpoena for documents Kozeny now seeks ordering discovery to be taken from Bourke. (*Id.*)[1]

Shortly after the subpoenas were issued under § 1782, the Claimants made an application in the London Actions for injunctive relief to restrain Mr. Kozeny from taking any further discovery under § 1782. Pursuant to this application, Mr. Justice Gross of the High Court of Justice issued an Order on September 6, 2001 (the "Gross Order"), restraining some, but not all, of the § 1782 discovery. However, the Gross Order was made on the condition that the Claimants (i) produce witness statements from the relevant witnesses at the appropriate time;

---

[1] Kozeny's previous subpoena the Court authorized also requested testimony. This subpoena does not. It seeks document production only from Bourke.

(ii) call the relevant witnesses to give oral evidence at trial; and (iii) notify the Defendant's solicitors promptly should they have any reason to believe that they will be unable to produce a witness statement and/or call any of the relevant witnesses at trial. (Hill Decl., Ex. 23)

Thereafter, Claimants made an application to stay the London Actions pending the conclusion of criminal investigations being undertaken by the United States Attorney for the Southern District of New York and the New York District Attorney. The London Actions were stayed on February 28, 2002.

The stay on the London Actions was lifted on March 6, 2006, in light of United States Indictments against Bourke and other individuals. (Hill Decl., Ex. 25) The High Court has now scheduled the London Actions were thereafter for trial for 10 to twelve weeks in January 2009.

On October 10, 2007, Mr. Justice Gross modified the Gross Order by, among other things, deleting the names of Bourke and several other witnesses from the list of relevant witnesses to be called at trial, thus lifting the injunction from proceeding with the § 1782 subpoenas as to them. (Hill Decl., Ex. 24) Indeed, the Court initially had enjoined the § 1782 discovery specifically because Bourke and the other witnesses would testify at trial and produce witness statements. Once they were no longer listed as "Relevant Witnesses", (i.e. the Claimants could no longer ensure that certain witnesses would attend trial to give evidence) there was no longer any reason to restrain § 1782 Discovery. The Court therefore accepted that Kozeny and the other Defendants are now to be permitted to proceed with § 1782 discovery of various witnesses, including Bourke.

### A.    Claimants' Allegations

Claimants allege that Kozeny, two companies of which he was an officer and director, Oily Rock Group Ltd. ("Oily Rock") and Minaret Group Ltd. ("Minaret"), and another individual defrauded and breached fiduciary duties by, among other things, selling Azeri privatization options to them from an inventory of certain Oily Rock affiliates or clients over which Oily Rock exercised investment discretion at prices in excess of those at which the alleged Oily Rock affiliates or clients supposedly obtained them. Claimants allege that they were innocent dupes who were wholly unaware that there would be high-level corruption, bribery, money laundering and other alleged criminal activities on the part of Kozeny, Oily Rock, Minaret and another individual involved in flying hundreds of millions of cash into Azerbaijan, one of the world's most corrupt countries, and making a deal with the Azeri Government to take over its multi-billion dollar state controlled oil company.

### B.    The Azeri Privatization Program

In 1995, the Azeri Government instituted a program by which it intended to privatize many of its previously state-owned enterprises. The Azeri government issued "vouchers" to purchase shares of privatized companies offered in privatization auctions conducted by the State Property Committee of Azerbaijan ("SPC"). The SPC also issued "options" which foreigners were required to own along with vouchers to participate in privatization auctions. Options were required for a foreigner to redeem vouchers at a privatization auction. The Claimants anticipated that in 1998, the State Oil Company of the Azerbaijani Republic, known as "SOCAR," would be privatized. SOCAR was the "crown jewel" of Azerbaijan.

The Azeri Government issued eight million vouchers for distribution to Azeri citizens, ostensibly to permit the citizens to participate in the privatization program. Approximately 7.2 million actually were distributed to Azeri citizens. The SPC estimated an underlying value for each voucher of just over U.S. $800, *i.e.*, U.S. $200 for each of the four individual checks contained in a voucher booklet. Vouchers were issued as bearer instruments so they could be freely purchased, sold and accumulated, and a secondary market arose for this purpose. Foreigners could purchase and own them, but foreigners had to purchase and own an equivalent number of options. Like vouchers, once issued by the SPC, options could also be purchased, sold and accumulated, and a secondary market arose for that purpose as well. Options traded in the secondary market at discounts of 60% or more from the SPC's official option price. Foreign investors were subject to a legal restriction which ostensibly limited their individual ownership to 400,000 vouchers.

The privatization program was held out as a three-stage process: a closed subscription in which ostensibly up to 15% of the shares would be sold to employees and some former employees of the state-owned enterprise to be privatized; an open voucher auction in which ostensibly at least 55% of the shares would be offered to anyone who owned vouchers and wished to participate; and an open cash auction at which ostensibly the remaining 30% of the shares would be offered to anyone who wished to participate.

Officially, the SPC was to formally announce publicly which of the state-owned enterprises would be auctioned, when they would be auctioned, provide the public with financial and other information about these enterprises, and conduct auctions open to everyone who owned vouchers and wanted to bid for shares of the enterprise.

## C.    Creation and Operation of Oily Rock and Minaret

Oily Rock was set up in July 1997 to act as an investment vehicle to acquire Azeri privatization vouchers and to participate in the Azeri privatization program through the voucher auctions. It was set up by or on the instructions of von Meiss Blum ("vMB"), a firm of lawyers practicing in Zurich, Switzerland, which subsequently acted as Claimants' lawyers as well. Initially, Oily Rock had an authorized share capital of 10,000 bearer shares of U.S. $1 each. Its authorized share capital increased to U.S. $150 million by November 7, 1997. On June 26, 1998 its authorized share capital increased to U.S. $450 million.

Kozeny was and is Oily Rock's Chairman. He was formally appointed as a director on April 23, 1998, as were former Senate Majority Leader George Mitchell, Frederic Bourke of Dooney & Bourke, Aaron Fleck and Shafik Gabr, an Egyptian industrialist.

Minaret was set up by vMB as a 100% owned subsidiary of Oily Rock. Minaret was set up to provide an infrastructure for Oily Rock's operations/investments in Azerbaijan. It also was established to operate as an investment bank in Azerbaijan and to act on behalf of clients who purchased vouchers and options. Minaret's principal function, however, was to fly millions in cash stashed in suitcases into Azerbaijan for Oily Rock and later $200 million for Claimants to purchase vouchers and options. Minaret held the cash in Swiss accounts until flown to Baku, where it was held in a secured vault in Minaret's offices.

In June/July 1997 Oily Rock began acquiring vouchers which were sold only in cash transactions. Initially, Oily Rock acquired vouchers direct from Azeri citizens at street markets. That stopped when Oily Rock was forced to buy vouchers direct from the Chechen "mafia" operating in Baku.

**D.**     **Kozeny's Deal With Azeri President Aliyev**

Kozeny was first introduced to Azeri President Heydar Aliyev, a former Soviet KGB General, as a result of the KGB's arrest of one of the Russian couriers who purchased vouchers. The KGB seized Oily Rock's cash and vouchers held by the courier. The head of the Azeri KGB suggested that Kozeny meet with President Aliyev.

President Aliyev welcomed Kozeny's presence in Azerbaijan and Oily Rock's investment in his country's privatization program. President Aliyev pointed out, however, that it was illegal for a foreigner to own vouchers without owning options, and he instructed Kozeny to visit with the President's son, Ilham Aliyev, who was then in charge of SOCAR and is now the Azeri President, and also with SPC Chairman Nadir Nasibli (also known as Nadir Nasibov).

Kozeny met with President Aliyev's son. He then met with Chairman Nasibov, who introduced Kozeny to the SPC's Deputy Chairman, Barat Nuriyev. Kozeny was instructed that Oily Rock had to buy options from and register options with the SPC. As a foreigner, Oily Rock was restricted to owning 400,000 options (thus limiting a foreigner's ownership of the vouchers to 100,000). He also was told, however, that Oily Rock could exceed the 400,000 option restriction through use of nominee corporations.

Kozeny arranged with the SPC to purchase approximately 16 million options: an initial tranche of 12,204,000 options in August 1997 at the local price of 2,000 Manats per option, or approximately U.S. $0.50; and a second tranche of 3,523,000 options at the SPC's officially increased price of 4,000 Manats per option, or approximately U.S. $1.00. Kozeny had vMB set up 45 nominee companies to hold the options and corresponding vouchers purchased by Oily Rock and other beneficial owners.

9.

President Aliyev made clear to Kozeny when they met in October 1997 that Oily Rock's ability as a foreigner to invest and participate in the Azeri privatization program depended upon having the President's "goodwill." Kozeny earned it by agreeing to provide the President and his associates (the "Azeri Officials") with a two-thirds participation in Kozeny's investments. Kozeny agreed Oily Rock would transfer ownership of two-thirds of Oily Rock's 16 million Options to Azeri Officials, *i.e.*, 10,484,666 (the "Azeri Options"), leaving 5,242,334 options for Oily Rock and other beneficial owners.

The ever present vMB formed three nominee companies for the Azeri Officials, Enkridge Holding Inc., Cudina Financial SA, and Estoria Portfolio SA, to hold the options for the Azeri Officials (the "Azeri Companies"). vMB also set up four Liechtenstein trusts for the Azeri Officials, Petrus, Pomerol, Latour and Rioja (names of French wines), to hold the shares of the nominee companies.

Immediately after Kozeny agreed Oily Rock would transfer two-thirds of its options to the Azeri Officials, they decided the SPC would boost the official option price to 100,000 Manats per option, or approximately U.S. $25-$26, effective November 1, 1997, which in turn boosted the value of the Azeri's Options from approximately U.S. $5.2 million to U.S. $262 million.

Kozeny also agreed with the Azeri Officials to arrange for Jemur Holdings Limited ("Jemur"), a finance company, to enter into three U.S. $100 million credit facility agreements with the Azeri Companies with a repayment date of June 28, 1998. (Hill Decl., Exs. 4-6) The repayment date was selected because the Azeri Officials indicated SOCAR would be privatized

by then and the Azeri Officials could repay the credit facilities from profits from Oily Rock's purchase of SOCAR.

The credit facility agreements provided that Oily Rock could acquire options from the Azeri Officials as needed to cover Oily Rock's voucher position at the SPC's official price of 100,000 Manats. As of March 20, 1998 Oily Rock had accumulated 1,960,000 vouchers. It owned 8,140,000 options, 2,897,666 of which were Azeri Options acquired from the Azeri Officials. As of March 20, 1998, the Azeri Officials owned 7,587,000 options.

### E.    Oily Rock's Aspen Investors

In December 1997, Kozeny spent the Christmas and New Year's holidays in Aspen, Colorado, a destination for the rich and famous and which Kozeny had begun visiting in mid-1997. Kozeny was introduced to the wealthy people who use Aspen as a winter playground. Many learned of Oily Rock's investment activities in Azerbaijan and asked to invest in Oily Rock. Kozeny consented, and they invested millions of dollars in Oily Rock stock. Among these Aspen investors was Frederic (Rick) Bourke of Dooney & Bourke.

Bourke and other Aspen investors did their own due diligence investigation of the investment opportunity. Bourke became one of Kozeny's daily companions. In late January and early February 1998, Kozeny, Bourke and others flew to Baku to investigate the SOCAR investment. Kozeny introduced them to the SPC Chairman and Deputy Chairman who discussed SOCAR's privatization and told them SOCAR would be privatized within two months. Bourke began promoting investments in Oily Rock to friends and business associates.

Bourke arranged for Kozeny to meet Senator Mitchell, a childhood friend of Bourke's. They met in Florida and discussed Bourke's strong desire that Mitchell become involved in Oily

Rock as an investor and director. Kozeny consented. Mitchell invested and in March 1998 along with Bourke was appointed as a director of Oily Rock. (Hill Decl., Ex. 7)

On April 22, 1998, Kozeny, Bourke, Mitchell and other investors flew to Baku to attend Minaret's official opening held on April 24 and 25. Through U.S. Ambassador Stanley Escudero, Mitchell arranged to meet with President Aliyev. Mitchell then spent 2½ hours alone with President Aliyev. (Hill Decl., Ex. 8)

During and following this trip, the Oily Rock investors discussed other appointments to Oily Rock's Board. In addition to Kozeny, Bourke, Mitchell and Aaron Fleck, who already were Oily Rock directors, Clayton Lewis and Leon Cooperman from Omega Advisors agreed to become directors. (Hill Decl., Ex. 9)

F.    **Omega's Introduction to the SOCAR Investment**

In late 1997 and early 1998, Aaron Fleck, an Oily Rock investor and director, proposed to Kozeny that they promote Omega to become an investor. Fleck knew Leon Cooperman, Omega's Chairman and Chief Executive Officer. Fleck arranged a meeting with Omega on February 27, 1998 for Kozeny to meet and explain the Azeri investment opportunity to Omega analysts. On March 11, 1998, Kozeny was invited back to meet with Clayton Lewis, the head of Omega's emerging market group, who since has pled guilty to felony charges in an Indictment filed in the Southern District of New York.

The February 27 and March 11 meetings were held in Omega's New York offices. On each occasion Kozney met with Cooperman and confirmed that the Azeri Officials were "in on the deal."

On March 17, 1998, Lewis and another Omega analyst flew with Kozeny to Baku to conduct due diligence. Kozeny arranged for them to meet with the SPC Chairman and the Deputy Chairman. They also visited Minaret's Baku offices where they inspected the strong room/vault where Oily Rock's vouchers, options and stash of cash were stored. They were shown the options in Minaret's custody that had been divided into three piles: one pile representing Oily Rock's options, and the other two piles representing the Azeri's Options. When Kozeny returned to Baku on March 23, he was instructed to sell the Azeri's Options to Omega.

Lewis immediately prepared a Highly Confidential Report describing the results of his due diligence investigation, which he provided to Cooperman on March 22. (Hill Decl., Ex. 10) The Report confirmed that Kozeny had personal access to the President and SPC; and that Kozeny possessed information about SOCAR's privatization totally unknown by the public and other potential investors.

Cooperman directed that investment agreements be prepared for Omega to invest up to 2.5% of the net asset value of the Omega Funds. Lewis authorized Pharos Capital to invest up to 15% of the net asset value of its fund.

When Kozeny returned from his March 23 trip to Baku, he went to Aspen. Lewis flew to Aspen and met with Kozeny the weekend of April 3-5. Kozeny prepared an agenda for his meeting discussion with Lewis. (Hill Decl., Ex. 11) Under the "Options" heading Kozeny provided that he and Lewis discuss these points:

> *"Aliyev/no more new options/confirmed with SPC*
>
> *Private deal with Azeri possible*
>
> *Prof. price $25 for up to 4m/i.e. 5% discount[2]*
>
> *SPC in control of the process*
>
> *Partnership issue and Presidents invitation/biding"*

Kozeny informed Lewis that "our friends" would sell four million options to Omega at U.S. $25 per option. He confirmed the sellers were the "Azeri side."

Lewis returned to New York on April 6 and began purchasing the Azeri Options for $25.

### G.    AIG's Introduction and Decision to Invest

On March 24, 1998, Lewis contacted David Pinkerton, managing director of AIG Global Investment Corporation, who is now the subject of the same Indictment pending against Bourke. On April 1, Cooperman and Lewis met with Pinkerton. They discussed the investment in detail. On April 3, 1998, Pinkerton and an analyst met with Lewis to again discuss AIG's investment. AIG thereafter conducted an intensive two month due diligence investigation.

AIG learned from Omega of Kozeny's relationship with President Aliyev and the SPC's Chairman and Deputy Chairman, but Omega forbade AIG from talking directly to Kozeny. AIG confirmed through its own sources that Kozeny had a "close relationship" with President Aliyev and the SPC; and that Kozeny had "preferential access" to and could arrange for Pinkerton to meet with President Aliyev and the SPC. (Hill Decl., Ex. 12)

---

[2] Prof. is an abbreviation for Professor, a reference to the SPC Deputy Chairman Nuriyev.

AIG learned that one of Oily Rock's investors was Shafik Gabr, an Egyptian industrialist and associate of Frank Wisner, AIG's Co-Chairman.  Pinkerton requested that Wisner meet with Gabr to ascertain what Gabr knew about Kozeny and Kozeny's relationship with President Aliyev.  (Hill Decl., Ex. 13)  Wisner did so.  He learned from Gabr that SOCAR would be privatized and that President Aliyev was involved in Kozeny's deal:

> "Alief [sic] is involved in the deal, however the specifics of his involvement are not known."  (*Id.*)

On April 28 Wisner discussed the results of his meeting with Gabr with Pinkerton.  (Hill Decl., Ex. 14)  Wisner concurred with Pinkerton that knowledge of Aliyev's involvement exposed them to the possibility that they might have to "pledge (plead) the 5th" Amendment privilege against self-incrimination.  (*Id.*)  They agreed to discuss the obvious FCPA issues with AIG's attorneys.  (Hill Decl., Ex. 15)

Pinkerton was assigned to do a follow up meeting with Gabr to reconfirm "Aliyev's involvement" in the deal and he and Wisner met with Gabr in Cairo, Egypt on May 17, 1998.  (Hill Decl., Ex. 16)

### H.    Oily Rock's Merger With the Azeri Companies

Shortly after April 4, 1998 Oily Rock and the Azeri Officials proposed that their interests be merged on a one-third/two-thirds basis before June 28, 1998, the due date of the credit facilities.  They agreed that each could draw down on the proceeds from the sales of the Azeri's Options.  The Azeri Officials drew down substantial sums from the proceeds.

On June 26, 1998, the merger was effected.  Oily Rock issued 279 million shares to the Azeri Officials representing approximately two-thirds of Oily Rock's share capital.

### I.     The Co-Investment, Custodian and Assumption Agreements

Claimants entered into two written agreements with Oily Rock and Minaret:  a Co-Investment Agreement, dated April 30, 1998; and a Custodian Agreement, dated April 14, 1998.   Oily Rock and/or Minaret agreed to act as the non-exclusive agent of the claimants to purchase Azeri vouchers and options for them.  AIG executed an Assumption Agreement, dated June 8, 1998, and became a party to both agreements.

From March through July 1998, the Omega Claimants invested approximately $126 million.   They purchased 669,131 vouchers for $59,504,471 and 2,676,557 options for $66,913,925.   Claimant Marlwood invested approximately $15 million.   It purchased 81,957 vouchers for $6,804,280 and 328,000 options for approximately $8.2 million.

### J.     Claimants' Loss of Their Investment

In September 1998, Cooperman terminated Lewis and Omega and AIG commenced an investigation of Kozeny's activities, President Aliyev's delays in privatizing SOCAR and the extent of their losses.  The investigation continued for months.

In October 1998, President Aliyev was re-elected in a landslide victory.  SOCAR still remained and remains today an Azeri Government enterprise.

In March 1999, AIG terminated its investment agreement with Pharos Capital.  AIG and Omega both terminated their relationship with Kozeny.

In October 1999, AIG filed its legal action against Kozeny.

The situation in Azerbaijan has not changed.  SOCAR has not been privatized, thus rendering Oily Rock's and Claimants' vouchers and options worthless.

**K.    Claimants' Allegations and Claims**

Claimants filed their Amended and Consolidated Particulars of Claim before the High Court of Justice Queen's Bench Division on March 19, 2007. Claimants allege, among other things, that the Co-Investment and Custodian Agreements precluded the Defendants from purchasing vouchers and options for the claimants from any affiliates or clients over which Oily Rock or Minaret exercised investment discretion. Claimants also allege the agreements precluded the purchase of vouchers and options at a price exceeding the prices paid by Oily Rock for such vouchers and options.

Claimants claim that Oily Rock and/or Minaret purchased the claimants' options from various Oily Rock affiliates and clients over which Oily Rock exercised discretion and paid those entities approximately $93.0 million in violation of the Co-Investment and Custodian Agreements. (Hill Decl., Ex. 20, ¶ 66)

The Claimants also claim that unbeknownst to them Oily Rock, Minaret and Kozeny were involved in using their cash and other funds to corrupt high-level Azeri government officials on a substantial scale. Claimants complain that Kozeny never informed them of this high-level corruption. (Hill Decl., Ex. 20, ¶¶ 29, 30) Accordingly, Claimants allege that Kozeny and the other Defendants are liable for breach of contract, fraud, conspiracy, concealment breach of fiduciary duty, and/or inducement of those breaches.

**L.    Kozeny's Defence**

On November 30, 2007, Kozeny, Oily Rock, and Minaret filed their Amended Consolidated Defence asserting that Claimants' claims are meritless for several reasons, but most prominently that Claimants invested specifically because they knew and believed that enormous

profits would be made because Azeri President Aliyev was "involved in the deal." In short, contrary to their protestations of innocence, Claimants knew of the corruption, are *in pari delicto*, and the alleged agreements upon which they sue Kozeny are illegal and unenforceable.

## M.    Summary Judgment

On April 28, 2006, Mr. Jonathon Hirst QC, sitting as a Deputy Judge of the Commercial Court, in Queen's Bench Division of the High Court of Justice in England and Wales, ruled on Kozeny's summary judgment application.

In his Judgment, Mr. Hirst found, among other things, that: (i) Lewis was aware of the corrupt nature of the investment and the agreement and arrangement used for carrying it into effect;[3] (ii) the Claimants would be taking advantage of known bribery (of Azeri officials) by their agent, and bribery was one object, or at least a known incident, of the joint venture for which the contracts provided the framework; (iii) the payment of bribes of Azeri officials was not peripheral to the venture, but central to its whole economics; (iv) bribery is a pernicious practice and a very serious crime of which the Court must take a grave view. Accordingly, the Court would decline to enforce the relevant agreements if the Claimants are to be treated as knowing that Azeri officials were being bribed by their agent. (Hill Decl., Exs. 17-18)

## N.    Involvement of Frederic Bourke

Frederic Bourke was a director and investor of Oily Rock. Bourke recruited former Senator George Mitchell to become an investor in and director of Oily Rock. Bourke resigned as a director of Oily Rock because he did not want to be seen as a director of a company

---

[3] Both Lewis and Hans Bodmer have pleaded guilty of violations of the FCPA. (Hill Decl., Ex. 19)

where two-thirds of the share capital was held by Azeri Officials.  Bourke then became a director of Oily Rock US.  Bourke submitted an affidavit alleging, among other things, that Kozeny made various representations regarding a potential investment in the Azeri privatization program; that he flew to Azerbaijan with Mr. Kozeny to investigate the privatization program and the purchase of vouchers and options; that he invested $5 million and that his British Virgin Islands company, Blueport International, made an aggregate investment of $8 million; that Kozeny supposedly made assurances that the Azeri investment would increase in value by the end of 1998; that Kozeny allegedly agreed to return Bourke's investment; and that he supposedly met with Kozeny in December 1998, at which time Kozeny advised Bourke to write off Bourke's investment.

The Indictment against Bourke pending in the Southern District of New York accuses Bourke of breaches of the Federal Corrupt Practices Act ("FCPA") by:

> Use of the mails and means and instrumentalities of interstate commerce corruptly and in furtherance of an offer, payment, promise to pay...for the purposes of (a) influencing acts and decisions of such foreign officials in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and (c) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist the defendants...

(Hill Decl., Ex. 25, ¶ 69)  Other charges against Bourke include violations of the Travel Act of 1952, a Conspiracy to Launder Money and actual Money Laundering.  (*Id.*)

There can be no doubt of Bourke's relevance to the London Actions, and Kozeny is entitled to obtain discovery from Bourke related to the subject matter of those actions.

## III.  ARGUMENT

Kozeny's *ex parte* request for discovery in aid of foreign proceedings easily satisfies the standards for obtaining discovery under 28 U.S.C. § 1782.  Section 1782 provides in relevant part that:

> The district court of the district in which a person resides or is found may order him to give testimony or statement or to produce a document or other thing for use in proceeding in a foreign or international tribunal.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782.  Under Second Circuit law, section 1782 requires the following three-part test be met prior to its invocation:

> (1) that the person from whom discovery is sought reside (or be found) in the district of the district court to which the application is made, (2) that the discovery be for use in a proceeding before a foreign tribunal, and (3) that the application be made by a foreign or international tribunal or "any interested person."

*Pan Americano*, 354 F. Supp.2d at 270 (S.D.N.Y. 2004); *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998) (quoting *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 875 (2d Cir. 1996) (per curiam)).  Further, the Supreme Court has stated that, "beyond shielding material safeguarded by an applicable privilege...nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260 (2004).  Once the statutory requirements are met, "a district court is free to grant discovery in its discretion." *Metallgesellschaft AG v. Hodapp*, 121 F.3d 77, 78 (2d Cir. 1997).

The Supreme Court also recently identified the following factors to assist district courts in determining whether to grant § 1782 applications:

> (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests.

*Intel*, 542 U.S. at 264-65. Applying these elements, the Court should appoint a commissioner to facilitate the gathering of evidence from Bourke.[4]

### A.    Bourke Resides or Can be Found in The District of Connecticut

On information and belief, Frederic Bourke resides at 17 Fort Hill Lane, Greenwich, Connecticut.

Hence, he resides or can be found in this judicial district.

### B.    Kozeny's Requested Discovery is for Use in Connection With A Pending Foreign Proceeding

As set forth above, Kozeny seeks discovery for use in connection with the London Actions. Hence, Kozeny satisfies the second requirement under § 1782 — that the evidence be sought for use in connection with a foreign proceeding.

---

[4] Under § 1782, this Court may appoint undersigned counsel as the commissioner. *See In re letter of Request for Judicial Assistance (Haiti)*, 669 F. Supp. 403, 405 (S.D. Fla. 1987) (confirming appointment of Haiti's U.S. law firm as commissioner to obtain evidence for Haitian proceedings); *see also In re Application of Doraville Properties Corp. for Judicial Assistance*, Misc. No. 1996 (S.D.N.Y. May 12, 2000) (appointing law firm as commissioner).

**C.    Kozeny is an "Interested Person" Entitled to Judicial Assistance Under § 1782**

Kozeny also qualifies as an "interested person" for purposes of 28 U.S.C. § 1782. He is a party to both foreign proceedings in the English High Court of Justice referenced above. It is bedrock law that a party to a foreign proceeding qualifies as an "interested person" under § 1782. *See, e.g., In re Esses*, 101 F.3d at 875 (noting the "clear" language of § 1782 and the legislative history that defines an interested person to include "one who is a 'party to . . . foreign or international litigation'").

**D.    The Documents Sought Are Not Within the English Court's Jurisdictional Reach**

The documents sought from Bourke are not within the jurisdictional reach of the English Courts. Bourke is a non-party to the London Actions. The Supreme Court has stated that "Nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264. The English Court has no jurisdiction to issue a subpoena against Bourke as a non-party, and Kozeny therefore has no means to secure discovery from Bourke absent § 1782(a) aid. Therefore, the first factor of the *Intel* test weighs in Kozeny's favor.

**E.    The English Court Does Not Oppose U.S. Federal Court Judicial Assistance**

The second factor of the Intel Test is "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id.* at 264-65. This factor

weighs in favor of Kozeny, as the English Court has not expressed opposition to U.S. Federal Court assistance, and has in fact, acknowledged and welcomed it.

The Second Circuit cautions courts not to engage in "speculative foray[s] into legal territories unfamiliar to federal judges," which would result in an "unduly expensive and time-consuming fight about foreign law, undermining the twin aims of the statute." *Metallgesellschaft AG*, 121 F.3d at 80 (quotations and citations omitted). Absent "authoritative proof . . . embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures," a district court should not refrain from granting discovery under § 1782. *Euromepa*, 51 F.3d at 1100. Indeed, Courts have recently found that a party may acquire discovery under § 1782 even if the discovery could not be discovered if they were located in the foreign jurisdiction. *Intel*, 542 U.S. at 260.

There is no authority, much less "authoritative proof," that the information sought in this case would be held undiscoverable by an English court. To the contrary, the Second Circuit has actually noted that there is "authoritative proof" that the type of discovery sought by Kozeny — pre-trial, third-party, document discovery — is *not* an affront to English laws or sovereignty. *See Euromepa*, 51 F.3d at 1100 n. 3 (discussing *South Carolina Ins. Co. v. Assurantie Maatschappij "DeZeven Provincien" N V*, 3 W.L.R 398 (Eng. 1986)). In *South Carolina Ins. Co.*, the House of Lords expressly considered whether to affirm its lower courts' injunction against a litigant who sought third-party discovery under § 1782 in a federal district court in Washington. The Law Lords vacated the injunction and held that the contested § 1782 discovery was not "conduct which is oppressive or vexatious or which interferes with the due process of the [British] court"

and thus did not "amount to unconscionable conduct" warranting an injunction. *Id.* (quoting *South Carolina Ins. Co.*).

Kozeny's request for discovery under § 1782 is similar to the third-party discovery requested by the applicant in the *South Carolina Ins. Co.* case. Accordingly, the discovery requested by Kozeny would not circumvent any "authoritative proof" of English law and is fully consistent with the twin aims of 28 U.S.C. § 1782. Therefore, the second *Intel* factor weighs in favor of granting § 1782 discovery.

### F.    Kozeny Does Not Seek to Circumvent Foreign Proof Gathering Restrictions or Other Policies of England or the United States

The third factor of the *Intel* test is "whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States". *Intel*, 542 U.S. at 265. There is no such attempt at circumvention in this case.

As explained above, the U.S. District Court for the District of Colorado stayed a parallel U.S. action pending the outcome of the London Actions, over Kozeny's vehement objections, in part because Kozeny could "seek documents and testimony from U.S. witnesses under . . . 28 U.S.C. § 1782, which provides for production of documents and taking testimony in aid of foreign litigation." (Hill Decl., Ex. 1, at 12) In opposing Kozeny's motion to stay the London Actions in favor of the then-pending American litigation, Claimant's counsel similarly represented to the British court that Kozeny would not be prejudiced by having to proceed in England, notwithstanding the presence of a large number of important witnesses in the U.S., because "[i]n addition to whatever discovery is available in the United Kingdom, under United States law Mr. Kozeny can take testimony and seek documents from witnesses in the United

24.

States in aid of the London proceeding. . . .  As a result, proceeding first in London will not deprive Mr. Kozeny of the opportunity to take discovery in the United States." (Hill Decl., Ex, 2 at ¶ 19 (citing § 1782)    Finally, the English Court varied the Gross Order restraining Kozeny from § 1782 discovery following the removal by Claimants of several individuals, including Bourke from its list of Relevant Witnesses, thus necessitating Kozeny's ability to take discovery from these individuals.  (Hill Decl., Ex. 24)  It can certainly be inferred from this express action that the English Court fully acknowledges and supports Kozeny's application for assistance under § 1782.  Under these circumstances it is only proper that this Court grant the application for judicial assistance as to discovery from Bourke.

### G.    The Bourke Subpoena is Not Unduly Intrusive or Burdensome

Finally, the Bourke Subpoena, attached as Exhibit A hereto, is not unduly intrusive or burdensome to Bourke.  The Bourke subpoena does not request any documents that are protected by any legally applicable privilege, including the attorney-client privilege. Additionally, the Bourke subpoena is limited in both time and scope, and seeks only specified categories of documents, each of which are relevant to the Claimants' Claims and Defendants' Defence, and for the period from January 1, 1995 to the present.  Therefore, the fourth factor of the *Intel* test weighs in Kozeny's favor.

### H.    Kozeny's Requested Discovery Comports With The Twin Aims of § 1782(a)

Since the requirements set forth by the Second Circuit and Supreme Court are satisfied, the Court should fashion a discovery order under § 1782 in light of the twin aims of the statute: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of

assistance to our courts." *Pan Americano*, 354 F. Supp.2d 269, 273 (S.D.N.Y. 2004); *Metallgesellschaft AG*, 121 F.3d at 79 (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)); *see also Nat'l Broadcasting Company, Inc. v. Bear Stearns & Co.*, 165 F.3d 184, 189 (2d Cir. 1999) (§ 1782 is intended "to accommodate international proceedings"); *Malev*, 964 F.2d at 101 (§ 1782 "grants wide assistance to others"). As explained above, Kozeny seeks the production and inspection of plainly relevant documents from Bourke, a person with knowledge in the London Actions, that are not overly broad or unduly burdensome, and that would not be available to Kozeny absent § 1782 assistance. This discovery will accordingly aid the English Courts in rendering a complete decision, with access to all relevant discovery. As a result, the instant request serves the twin aims of § 1782 by efficiently assisting Kozeny's participation in international litigation and by sending a strong, clear signal to foreign countries to provide similar reciprocal assistance to U.S. federal courts when needed.

## IV.    CONCLUSION

For all the foregoing reasons, this Court should grant the application of Kozeny for judicial assistance under § 1782. The proposed subpoena to be issued to Frederic Bourke pursuant to the order of assistance is attached hereto for the Court's convenience as Exhibit A. A proposed form of Order is attached as Exhibit B.

Dated:  May ___, 2008

ROBINSON & COLE LLP

By _____

William J. Kelleher III

Financial Centre
695 East Main Street
P.O. Box 10305
Stamford, CT  06904-2305
Telephone:  (203) 462-7500
Facsimile:  (203) 462-7599
Email:  wkelleher@rc.com

295590 v2/CO

# EXHIBIT A

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF      CONNECTICUT

| | |
|---|---|
| IN RE APPLICATION OF VIKTOR KOZENY FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | **SUBPOENA IN A CIVIL CASE** |

Case Number:[1]

TO:   Frederic Bourke
       17 Fort Hill Lane
       Greenwich, CT  06831

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE EXHIBIT A ATTACHED HERETO

| PLACE    Robinson & Cole LLP Financial Centre, 695 East Main Street, Stamford, CT 06904-2305 | DATE AND TIME 6/20/2008 9:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) Attorney for Viktor Kozeny | DATE |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

EXHIBIT A TO
SUBPOENA TO FREDERIC BOURKE

1. All documents (as defined in FED. R. CIV. P. 34) (hereinafter "Documents") from January 1, 1995 to the present relating or referring to the program by which the Republic of Azerbaijan intended to privatize its state-owned enterprises including but not limited to the Azeri government issuance of "vouchers" and "options" which could be used in the acquisition of the state-owned enterprises, in particular the State Oil Company of the Azerbaijani Republic ("SOCAR").

2. All Documents from January 1, 1995 to the present relating or referring to Viktor Kozeny ("Kozeny").

3. All Documents from January 1, 1995 to the present relating to or referring to Oily Rock Group, Ltd., Oily Rock U.S. Advisers, Ltd., and/or Oily Rock Investment L.P. ("Oily Rock").

4. All Documents from January 1, 1995 to the present relating or referring to the Minaret Group Ltd. and/or Minaret U.S. Advisers, Ltd. ("Minaret").

5. All Documents from January 1, 1995 to the present relating or referring to Omega Advisors, Inc. ("Omega") and/or any of its officers, directors, agents and employees including but not limited to Leon Cooperman, Eric Vincent, Paul Swigart, Clayton Lewis and/or Timothy Moe and relating to SOCAR, Kozeny, Oily Rock, Minaret and/or the privatization program.

6. All Documents from January 1, 1995 to the present relating or referring to any and all persons and entities on whose behalf Omega invested funds, directly or indirectly, in vouchers and/or options issued in connection with the privatization program of the Republic of Azerbaijan, including but not limited to: Omega Capital Investors, L.P., The Common Fund, Omega Institutional Partners, L.P., GAMSAM, Omega Investments, Inc., Housman Holdings N.V., Goldman Sachs & Co. Profit Sharing Master Trust, Omega Overseas Partners, Ltd., Omega Capital Partners, L.P., Omega Local Markets Fund, L.P., Omega Local Markets Fund, Ltd., and/or CIM VIII, L.L.C.

7. All Documents from January 1, 1995 to the present relating or referring to any and all entities by which or through which Omega made its investment in SOCAR, Oily Rock and/or Minaret including but not limited to Omega Group Holdings, Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp., Telos Finance Ltd., Babson Invest S.A., Cadwell Development Corp., Clifftop Invest Ltd., Conak International Inc., Freehold Trading Inc., Global Securities Ltd., Hilgore Overseas Ltd., Kays Holdings S.A., Ossian Overseas Ltd., Penasco Business Inc., Reno Financial Inc., Shireton Financial Corp. and/or any other offshore shell company.

8. All Documents from January 1, 1995 to the present relating or referring to Pharos Capital Management, L.P. ("Pharos") and/or any of its subsidiaries, officers, directors, agents and

employees including but not limited to Clayton Lewis and relating to SOCAR, Kozeny, Oily Rock, Minaret and/or the privatization program.

9.    All Documents from January 1, 1995 to the present relating or referring to any trips you made to Azerbaijan relating to SOCAR, Kozeny, Oily Rock, Minaret and/or the privatization program.

10.   All Documents relating or referring to meetings with Azeri government officials including but not limited to the President of the Republic of Azerbaijan (Heydar Aliyev), the President's son (Iliam Aliyev), the Chairman of the Azeri State Property Committee (Nadir Nasibov), the Deputy Chairman of the State Property Committee (Barat Nuriyev) and/or any member of the Azeri State Property Committee relating to SOCAR, Kozeny, Oily Rock, Minaret and/or the privatization program.

11.   All Documents from January 1, 1995 to the present relating or referring to due diligence review and investigation of the privatization program, SOCAR, Kozeny, Oily Rock, and/or Minaret including but not limited to all drafts and iterations of Omega's Highly Confidential Memorandum of March 22, 1998.

12.   All Documents from January 1, 1995 to the present relating or referring to American International Group, Ltd. and/or all American International Group, Ltd. subsidiaries and affiliates including but not limited to AIG Global Investment Corporation and National Union Fire Insurance Company of Pittsburgh, PA and/or any of their officers, directors, agents and employees including but not limited to Maurice Greenberg, Frank Wisner, Edward Matthews, David Pinkerton, and Rajveer Ranawat (collectively "AIG") and relating to SOCAR, Kozeny, Oily Rock, Minaret and/or the privatization program.

13.   All Documents from January 1, 1995 to the present relating or referring to any and all entities by which or through which AIG made its investment in SOCAR, Oily Rock and/or Minaret including but not limited to Marlwood Commercial Inc., Ridgeway Universal S.A. and/or any other offshore shell company.

14.   All Documents from January 1, 1995 to the present relating or referring to the following individuals' interest in, discussion and/or relationship to SOCAR, Kozeny, Oily Rock, and/or Minaret: Aaron Fleck, Stuart Bernstein, David Bonderman, Jack Schneider of Allen & Company, Eugene Golub, Fred Malek, Scott von Stein of Kroll & Associates, Carrie Wheeler, Don Mysco, Tom McCloskey, George Gradow, George Mitchell, Shelly Friedstein, Bob Hurst, Richard Friedman, Nancy Friedman, Graham Wisner, Jim Fifield, Albert Glickman and/or Shafik Gabr.

15.   All Documents from January 1, 1995 to the present relating to any direct or indirect compensation, consideration and/or finder's fee paid by the following individuals in connection with any investment related to the privatization program:  Aaron Fleck, Stuart Bernstein, David Bonderman, Jack Schneider of Allen & Company, Eugene Golub, Fred Malek, Carrie Wheeler, Don Mysco, Tom McCloskey, George Gradow, George Mitchell, Shelly Friedstein, Bob Hurst, Richard Friedman, Nancy Friedman, Albert Glickman, and/or Shafik Gabr.

16.     All Documents from January 1, 1995 to the present relating to communications with Kozeny, Frank Chopin, Jacqueline Miller, Oily Rock and/or Minaret (including Charles Towers-Clark and Tom Farrell).

17.     All Documents from January 1, 1995 to the present relating or referring to communications with any partner or employee of von Meiss Blum & Partners including but not limited to Hans Bodmer.

18.     All Documents from January 1, 1995 to the present relating or referring to communications with any partner or employee of Hess Consulting, Hess Grant Thornton and/or Grant Thornton (Switzerland).

19.     All Documents from January 1, 1995 to the present relating or referring to Leon Cooperman, George Mitchell, Aaron Fleck, and/or Eric Vincent's service as an officer, director, agent and/or employee of Oily Rock and/or Minaret.

20.     All Documents from January 1, 1995 to the present relating or referring to the Letter of Intent between Omega and Pharos and Oily Rock and Minaret and the Custodian Agreement and Co-Investment Agreement.

21.     All Documents relating to the circumstances surrounding Clayton Lewis' resignation from or termination by Omega.

22.     All Documents relating or referring to the circumstances of Eric Vincent's and/or Paul Swigart's resignation from or termination of employment with Omega.

23.     All Documents from January 1, 1995 to the present relating to your personal investment and/or stock certificates you received relating to SOCAR, Kozeny, Oily Rock and/or Minaret, including bank statements evidencing payments out and payments in to Oily Rock.

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

Case No. _____

IN RE APPLICATION OF VIKTOR KOZENY
FOR JUDICIAL ASSISTANCE PURSUANT TO
28 U.S.C. § 1782

### ORDER DIRECTING DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Upon consideration of the Application for an Order Directing Document Discovery from Frederic Bourke Pursuant to 28 U.S.C. § 1782 and Supporting Brief submitted by Viktor Kozeny ("Application"), it appears that the requirements of 28 U.S.C. § 1782 have been satisfied. Accordingly, it is

HEREBY ORDERED that the Application is granted to the extent set forth below; and it is

FURTHER ORDERED that Kozeny's U.S. counsel Cooley Godward Kronish LLP is appointed a Commissioner of the Court for purposes of 28 U.S.C. § 1782 and is authorized pursuant to that statute to issue the subpoena to non-party witness Frederic Bourke ("Witness") in the form attached as Exhibit A to the Application; and it is

FURTHER ORDERED that the Witness is directed to respond to said subpoena in accordance with the Federal Rules of Civil Procedure, and it is

FURTHER ORDERED that Cooley Godward Kronish LLP shall deliver copies of this Order and any subpoena issued pursuant to this Order to the parties to the foreign proceeding identified in the Application.

Dated: _____, 2008

BY THE COURT:

_____
United States District Court Judge

295743 v1/CO

2.